# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00009-CR

**Demond Bartley, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-16-300680, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Demond Bartley of the offense of aggravated assault with a deadly weapon and assessed punishment at 30 years' imprisonment. *See* Tex. Penal Code § 22.02(a)(2). In two issues on appeal, Bartley asserts that the evidence is insufficient to support his conviction and that the district court abused its discretion in admitting hearsay testimony. We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence that on April 14, 2016, Bartley stabbed Aboubakar Sylla with a knife inside Sylla's apartment home in South Austin. Sylla, who is intellectually disabled and thus had difficulty communicating, testified that on the day of the incident, his friend Peter and Peter's girlfriend Jane[1] were staying at Sylla's apartment. Peter was sick at the time, and

---

[1] We refer to Peter's girlfriend using the pseudonym Jane because she was a minor at the time of the offense. *See* Tex. R. App. P. 9.10(a)(3).

Jane had left the apartment. She returned with Bartley, her uncle. Sylla, who could not drive, asked Bartley if he could drive him to a gas station to "get medicine for Peter." Bartley demanded "gas money" from Sylla before he would do so. Sylla refused, telling Bartley that "you can't just use that gas money because I've been putting a roof on top of [Jane's] head and I've been feeding her with everything that I have." Sylla recounted, "Then he got mad because I said that. Then the next thing that I know is we just got into it."

Sylla testified that he and Bartley began fighting in his bedroom and that Bartley threw the first punch, hitting Sylla in the face. This prompted Sylla to "start hitting him back." As the two men fought, they "kind of fell on the bed" and Jane joined in the fight, scratching Sylla in the face. Sylla "didn't want to put his hands on her," so he stopped fighting and got up from the bed. Bartley then went into the kitchen while Sylla remained in the bedroom and locked the door. Bartley returned to the bedroom and tried to open the door using a knife. Before Bartley could open the door, Sylla was able to "break the knife" using his hand. However, Bartley went back to the kitchen and returned to the bedroom with a "bigger knife," and this time, "he got through" the door. Bartley proceeded to stab Sylla repeatedly, in his arm, shoulders, and chest. After he stopped stabbing Sylla, Bartley returned to the kitchen with the knife, rinsed it in the sink, and wrapped it in a towel. Bartley then left the apartment with the knife. Peter and Jane went with him, leaving Sylla alone in the apartment. Before passing out from blood loss, Sylla managed to walk to the main office of the apartment complex, where apartment employees assisted him until EMS arrived.

Bartley admitted that he stabbed Sylla but claimed that he did so in self-defense. Bartley testified that when he refused to drive Sylla to the gas station, Sylla became angry and hit him "two times in the face." In response, Bartley "swung back" at Sylla "about four times." After

2

this initial altercation, Sylla went into his bedroom and told Jane and Peter that if they did not remove Bartley from the apartment, Sylla would "kill his ass." As Bartley began to leave the apartment, Sylla "went towards the kitchen." When Bartley turned around, Sylla had a knife in his hand and swung it at Bartley. Bartley testified that he defended himself by hitting Sylla with his fist, who stumbled but "kept attacking" Bartley. Bartley then took another knife from the kitchen and used it to stab Sylla. Bartley explained, "I felt the need that I had to attack him because if I don't, then he's going to use that knife and really hurt me or kill me." He added, "It's like he didn't want to stop attacking me, and I felt like I had to defend myself." Bartley claimed that the fight ended when Jane and Peter yelled at them to stop. Sylla "retreated" into his bedroom and Bartley left the apartment with Jane and Peter.

During the investigation into the stabbing, Sergeant Stephen Willis of the Austin Police Department interviewed Jane. Acting on information obtained during that interview, officers discovered knives from Sylla's apartment inside a dumpster located outside a McDonald's restaurant in South Austin.

Based on the above and other evidence, which we discuss in more detail below, the jury found Bartley guilty of aggravated assault with a deadly weapon and assessed punishment at 30 years' imprisonment as noted above. After the district court rendered judgment on the verdict, Bartley filed a motion for new trial, which the district court denied. This appeal followed.

## ANALYSIS

**Evidentiary sufficiency**

In his first issue, Bartley asserts that the evidence is insufficient to support his conviction. Specifically, he claims that the State failed to prove beyond a reasonable doubt that

3

Bartley did not stab Sylla in self-defense, that Sylla was not a credible witness, and that the State failed to present DNA and other forensic evidence to support its theory of the case.

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010)). "In assessing the sufficiency of the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 607–08 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Id*. at 608 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge is one that 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018) (quoting *Malik*, 953 S.W.2d at 240).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Id*. (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id*. (citing *Brooks*, 323 S.W.3d at 922; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Reviewing courts are not to take a "divide-and-conquer" approach to the

4

evidence, "separating each piece of evidence offered to support Appellant's conviction, followed by speculation on the evidence State did not present." *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). Instead, we are to determine "whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Adames*, 353 S.W.3d at 860. "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608 (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id*. (quoting *Brooks*, 323 S.W.3d at 899). "A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

In this case, Bartley was charged with committing the offense of aggravated assault with a deadly weapon. A person commits that offense if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon—here, a knife— during the commission of the assault. *See* Tex. Penal Code §§ 22.01(a)(1), .02(a)(2); *see also id*. § 1.07(a)(17)(B) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"). An assault is justified as an act of self-defense "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. § 9.31(a). Similarly, "a person is justified in using deadly force against another" if using force is justified under section 9.31 and "the actor reasonably believes the deadly force is immediately necessary" to protect himself "against the other's use or attempted use of unlawful deadly force." *Id*. § 9.32(a)(1), (2)(A).

5

In a sufficiency challenge to the jury's rejection of a self-defense theory, reviewing courts must be mindful of the parties' respective burdens at trial: "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991)). "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Id.* (quoting *Zuliani*, 97 S.W.3d at 594). "Thus, '[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.'" *Id.* at 609 (quoting *Saxton*, 804 S.W.2d at 914). Ultimately, "the issue of self-defense is an issue of fact to be determined by the jury," and "the legal sufficiency standard does not permit us to substitute our view of the credibility of the witness testimony for the jury's." *Id.* at 609, 611.

On the other hand, "these principles affording deference to the jury's credibility determinations are not without limits." *Id.* at 611. "A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Id.* (citing *Adames*, 353 S.W.3d at 860). "Moreover, a jury is not permitted to disregard undisputed

6

objective facts that can support only one logical inference." *Id*. (citing *Brooks*, 323 S.W.3d at 907; *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006)). Nevertheless, we are to defer to the jury's rejection of witness testimony unless there is some basis in the record for us to conclude that the jury's credibility determinations were "irrational." *See id*.

Here, the jury was presented with two conflicting accounts of the stabbing. As summarized above, Sylla testified that Bartley broke open Sylla's bedroom door, entered the bedroom, and stabbed Sylla repeatedly with a knife. In contrast, Bartley testified that Sylla attacked Bartley with a knife in an area between the bedroom and the living room as Bartley was attempting to leave the apartment, and Bartley defended himself by stabbing Sylla with a knife that he had retrieved from Sylla's kitchen. For the following reasons, we cannot conclude that it was "irrational" for the jury to reject Bartley's version of events.

Bartley admitted on cross-examination that he had stabbed Sylla "at least" five times, in both his arm and his chest. The jury could have reasonably inferred that by stabbing Sylla in such a manner, Bartley went well beyond what was "immediately necessary" to defend himself, even if Sylla had been the aggressor. *See* Tex. Penal Code § 9.31 (limiting self-defense to degree of force that actor "reasonably believes . . . is immediately necessary to protect the actor against the other's use or attempted use of unlawful force"). Moreover, the jury could have rejected Bartley's claim that Sylla was the aggressor based on evidence tending to show that Sylla's injuries were serious and life-threatening, whereas the extent of Bartley's injuries, by his own admission, was limited to a cut on his hand that he was able to treat on his own without medical attention. Further, Bartley admitted that after the stabbing, he fled the apartment, did not contact the police or EMS even though he knew that Sylla had been injured and was bleeding, stopped at a nearby McDonald's where he rinsed his injured hand and wrapped it in

7

paper towels, and drove to his sister's place of employment, where he exchanged his car with his sister's truck. The jury could have reasonably inferred that these actions were consistent with a "consciousness of guilt" and inconsistent with Bartley's claim that he believed himself to be justified in stabbing Sylla. *See Clayton*, 235 S.W.3d at 780-81 (recognizing defendant's flight from crime scene and failure to contact authorities as circumstantial evidence that defendant believed himself to be guilty).

Bartley is correct that there were some inconsistencies in certain aspects of Sylla's testimony. For example, Sylla claimed that he was not using marijuana or alcohol at the time of the stabbing. However, blood tests taken at the hospital after the stabbing revealed that Sylla had tested positive for those and other drugs. Also, Sylla had a history of self-harm, specifically cutting himself, but he testified that he had not done so in "years." This was contrary to the testimony of Sylla's mother, who claimed that Sylla had cut himself a "couple of weeks" before the incident. Additionally, when Sylla described the stabbing to Lila Wilds, the property manager at his apartment complex, he told her that the assailant had "broken into" his apartment, which was inconsistent with his testimony indicating that he had let Bartley into his apartment when Bartley arrived with Jane.

Nevertheless, we cannot conclude that these inconsistencies were "so significant that they rise to the level of establishing that it would have been irrational for the jury to credit any part of [Sylla's] testimony whatsoever." *Braughton*, 569 S.W.3d at 612. The jury, which was aware of Sylla's intellectual disability and his difficulty communicating, was entitled as the factfinder to discount the inconsistences in Sylla's testimony while crediting other portions of his testimony. *See id.*

8

Specifically, the jury could have credited Sylla's testimony relating to the stabbing itself, which was consistent with other evidence in the record. Sylla testified that the stabbing occurred in his bedroom and that when Bartley first tried to open the locked bedroom door with a knife, Sylla was able to "break the knife." Consistent with this testimony, Officer Brian McKalip of the Austin Police Department, who had responded to the report of the stabbing, testified that when he arrived at Sylla's apartment, he observed a "big puddle of blood" in the bedroom, along with a "broken blade of a knife" in the blood puddle. Another APD officer, William Nelson, testified similarly that there was a "broken knife in the bedroom," that the "majority of the blood was in the bedroom," and that "it looked like there had been a struggle in the bedroom." Additionally, Sylla testified that after the stabbing, Bartley had wrapped in a towel the knife that he had used to stab Sylla and left the apartment with that knife. Consistent with this testimony, officers testified that during their investigation, they discovered knives from Sylla's apartment, wrapped in clothing and dish towels, located inside a dumpster outside the same McDonald's restaurant where Bartley testified he had stopped after the stabbing. In light of this and other evidence that was consistent with Sylla's testimony, we cannot conclude that it was irrational for the jury to accept Sylla's account of the assault.

Finally, we disagree with Bartley's contention that the State's failure to present DNA and other forensic evidence, such as any testing of the blood found in Sylla's apartment and on the knives allegedly used in the offense, renders the evidence insufficient to support the conviction. This was not a case in which the identity of the assailant was unknown or disputed. Bartley admitted that he had stabbed Sylla repeatedly in Sylla's apartment using a knife that he had found in Sylla's kitchen, but he claimed that he had acted in self-defense. Thus, this case turned on whether the jury believed Bartley's or Sylla's version of events. We cannot conclude

9

on this record that the absence of DNA and other forensic evidence made the jury's decision to accept Sylla's account of the stabbing irrational. *See Shaw v. State*, 329 S.W.3d 645, 657–58 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (concluding that "DNA evidence was not necessary to convict appellant" in case where complainant's testimony "by itself" was sufficient to support conviction); *Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (concluding that victim's testimony "standing alone" was sufficient to support aggravated-robbery conviction and that "a rational jury could have found appellant guilty of [the offense] without DNA evidence, fingerprint evidence, or evidence of the" weapon that was used in offense).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Bartley committed the offense of aggravated assault with a deadly weapon and could have found beyond a reasonable doubt that Bartley did not act in self-defense. *See Braughton*, 569 S.W.3d at 612–13; *Saxton*, 804 S.W.2d at 914. Accordingly, the evidence is sufficient to support his conviction. We overrule Bartley's first issue.

**Hearsay**

In his second issue, Bartley asserts that the district court abused its discretion in admitting what he claims is inadmissible hearsay relating to the discovery of the knives from Sylla's apartment that were found in a dumpster outside a McDonald's restaurant. Specifically, Bartley contests the admissibility of the following testimony elicited from Sergeant Willis, who had interviewed Jane during the investigation:

> Q. And during the course of your interview [with Jane], did you learn the location of the knives used in this offense?

10

| | |
|---|---|
| [Defense counsel]: | Objection, Your Honor, I believe this is going to call for hearsay. |
| [The court]: | As long as—can you rephrase the question? |
| [Prosecutor]: | Yes. |
| Q. | After you spoke with [Jane], what did you do? |
| A. | I showed her a Google map, and she pointed out a location that they had gone to. |
| [Defense counsel]: | Objection, Your Honor, hearsay. |
| [The court]: | He just said she pointed. I'll allow it. |
| Q. | I'm sorry, could you say that again? |
| A. | I showed her a Google map of the area, and she pointed out a McDonald's that they had gone to. |
| Q. | And what was significant about that? |
| A. | She described it as an area— |
| [Defense counsel]: | Objection. |
| [The court]: | Okay. Sustained. |
| Q. | After you had the map and identified that McDonald's location, what did you do with—what did you do? |
| A. | I then contacted uniformed members of the Gang Unit and they went to that location, searched the dumpster behind that McDonald's and found inside the dumpster knives, broken knives or knives from the apartment that were wrapped up in a T-shirt. |

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). A "statement" is "a person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression." Tex. R. Evid. 801(a). Bartley contends that in the above line of questioning, Willis testified to "nonverbal conduct that

11

[Jane] intended as a substitute for verbal expression," specifically, Jane pointing to the location of a McDonald's restaurant on a Google map. Consequently, in Bartley's view, "the testimony regarding the allegation that the knives used in the altercation were found in a dumpster behind a McDonald's restaurant was hearsay and should have been excluded."

As an initial matter, the State asserts that Bartley failed to preserve error, if any, in the admission of this testimony. We agree. The rules for preserving error in the improper admission of evidence are well settled. "Under Texas law, 'if, on appeal, a defendant claims the trial judge erred in admitting evidence offered by the State, this error must have been preserved by a proper objection and a ruling on that objection.'" *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)). "A proper objection is one that is specific and timely." *Id.* "Further, with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered." *Ethington*, 819 S.W.2d at 858. "The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury." *Martinez*, 98 S.W.3d at 193.

In the above line of questioning, Bartley objected after Willis testified, "I showed [Jane] a Google map, and she pointed out a location that they had gone to." The district court overruled Bartley's objection to that testimony, noting that "[h]e just said she pointed." However, after the district court overruled this objection, the State asked Willis to "say that again." Rather than repeat verbatim his earlier testimony, Willis provided more specific information, testifying as follows: "I showed her a Google map *of the area*, and she pointed out a *McDonald's* that they had gone to." (emphasis added). Bartley failed to object to this additional testimony. The State next asked Willis, "[W]hat was significant about that?" Bartley objected to this question, and the district court sustained the objection. However, after that, the State elicited

12

more testimony from Willis relating to Jane's identification of the McDonald's location, asking him, "After you had the map and identified that McDonald's location, what did you do with—what did you do?" Willis testified that APD officers "searched the dumpster behind that McDonald's and found inside the dumpster knives, broken knives or knives from the apartment that were wrapped up in a T-shirt." Bartley did not object to either the State's question or Willis's answer. Also, at no point during the line of questioning did Bartley obtain a running objection to testimony relating to this matter or request a hearing outside the presence of the jury.

In sum, although Bartley objected when Willis first testified to Jane's conduct in "point[ing] out a location" on a Google map, he failed to object when Willis testified more specifically that Jane had, on a Google map "of the area," "pointed out a McDonald's that they had gone to." Bartley also failed to object to Willis's subsequent testimony that officers went to "that McDonald's," searched the dumpster there, and found knives inside. Because Bartley's complaint on appeal relates to the admissibility of Willis's specific testimony involving the McDonald's dumpster where the officers found the knives, we agree with the State that Bartley failed to preserve error, if any, in the admission of this evidence. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1); *Martinez*, 98 S.W.3d at 193; *Ethington*, 819 S.W.2d at 859–60.

Moreover, even if Bartley's objection to Willis's initial testimony had been sufficient to preserve error, if any, in the admission of Willis's subsequent testimony, we could not conclude on this record that Bartley was harmed by the alleged error. "The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008)). "Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights." *Id.* (citing Tex. R. App. P. 44.2(b)). The Court of Criminal Appeals has

13

construed this to mean that "an error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Taylor*, 268 S.W.3d at 592). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id.*

When assessing the harm from improperly admitted hearsay, it is well established that "[i]f the fact to which the hearsay relates is sufficiently proved by other competent and unobjected to evidence . . . the admission of the hearsay is properly deemed harmless." *Anderson v. State*, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986); *see Marshall v. State*, 210 S.W.3d 618, 630–31 (Tex. Crim. App. 2006); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994); *Temple v. State*, 342 S.W.3d 572, 600–01 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd); *see also Thorpe v. State*, No. 03-18-00070-CR, 2019 Tex. App. LEXIS 4292, at *8–9 (Tex. App.—Austin May 24, 2019, no pet. h.) (mem. op., not designated for publication).

Here, multiple APD officers testified, without objection, to the same or similar facts relating to the discovery of the knives in the McDonald's dumpster. For example, the State elicited the following testimony from Detective Jason Acevedo, who assisted in the investigation:

Q. Also during your investigation did you learn the location of where the knives used in the offense were?

A. Yes.

Q. Where did you learn they were?

A. In a dumpster between the HEB and the McDonald's.

14

Additionally, Officer Christopher Wille, who searched the dumpster, testified that he was "advised that I'd be looking for items wrapped up in a black T-shirt, sweatshirt and some dish towels." The State then asked, "Were you told what items?" Wille testified, "Specifically knives." Finally, Detective Joseph Harris, the lead investigator in the case, testified that officers "took the blades from the [apartment] and the handle from the [apartment]" and "compared them to the knives recovered from the exact dumpster that we were—was described by the witness as where they were destroyed and we compared them and they were the exact same knives." When asked "what witness described that location," Harris testified without objection, "That was [Jane]."

Based on the above and other evidence, we cannot conclude on this record that Bartley was harmed by any error in admitting Sergeant Willis's testimony relating to Jane's conduct in pointing on a map to the location of the knives. We overrule Bartley's second issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Goodwin and Triana

Affirmed

Filed: July 31, 2019

Do Not Publish